# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JESSE A. WATSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:09CV00039 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Lewey K. Lee, Lee & Phipps, P.C., Wise, Virginia, for Plaintiff; Heather Benderson, Assistant Regional Counsel, and Allyson Jozwik, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I vacate the final decision of the Commissioner of Social Security (the "Commissioner") and remand for further proceedings consistent with this Opinion.

I

The plaintiff, Jesse A. Watson, filed this action challenging the Commissioner's decision to deny his claim for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act ("Act"),

42 U.S.C.A. §§ 401-34, 1381-83f (West 2003 & Supp. 2010). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g), 1383(c)(3).

Watson previously filed a claim with the Social Security Administration for disability benefits due to back pain, anxiety, depression, agoraphobia, and left leg pain that purportedly left him disabled as of June 2, 2003. This claim was denied administratively on April 17, 2006, and after unsuccessfully challenging that decision in this court, *see Watson v. Astrue*, No. 2:06CV00051, 2007 WL 2481343 (W.D. Va. Aug. 30, 2007) (Sargent, J.), Watson protectively filed a new claim for benefits on June 13, 2006, alleging that his disability began April 18, 2006. This latest claim was denied initially and upon reconsideration. At Watson's request, on January 15, 2008, an administrative law judge ("ALJ") held a hearing on Watson's latest claim, in which both Watson, represented by counsel, and a vocational expert ("VE") testified. The ALJ rejected Watson's claim on February 29, 2008. The Commissioner's decision became final when the Social Security Administration's Appeals Council denied Watson's request for review on May 6, 2009. Thereafter, Watson filed his Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross-motions for summary judgment and have fully briefed and orally argued the issues. The case is now ripe for decision.

Watson was twenty-eight-years old at the time of the ALJ's decision, a person of younger age under the regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Watson attended school through the tenth grade but failed to graduate from high school. Before the alleged onset of his disability, Watson worked as a farm worker, a sales agent, a fast-food cashier, a waiter, and an internet-services help-desk clerk.

Watson claims he is unable to work because of a combination of impairments including back pain, depression, and anxiety. He provided medical records to the ALJ to substantiate his claim. After reviewing the evidence, the ALJ found that Watson suffered from the severe impairment of degenerative joint disease. The ALJ determined that this impairment does not qualify as any of the agency's listed disabilities.

The ALJ concluded that Watson had the residual functional capacity to perform light-exertion work that involves no more than six hours of standing or walking and six hours of sitting per eight-hour day, that requires only occasional climbing of stairs and ramps (never of ladders, scaffolds, or rope), stooping, kneeling, crawling, and crouching, and that avoids concentrated exposure to vibrations. The VE testified that someone with Watson's residual functional capacity would be able to perform the duties of Watson's previous jobs as a sales agent, a fast-food cashier, a waiter, and

an internet-services help-desk clerk. Therefore, the ALJ concluded that Watson was not disabled.

Watson argues the ALJ's decision is not supported by substantial evidence. For the reasons detailed below, I agree.

III

The plaintiff bears the burden of proving that he is suffering from a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2009). If it is

determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *See id.*; *Bennett v. Sullivan*, 917 F.2d 157, 159 (4th Cir. 1990). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Reichenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985). If the claimant can perform work that exists in significant numbers in the national economy, then he does not have a disability. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b) (2009).

This court must uphold the ALJ's findings if substantial evidence supports them and they were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted). This standard "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ, not this court, to resolve evidentiary conflicts, including inconsistencies in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Additionally, the adjudication of Watson's previous claim of disability by the Social Security Administration (the "SSA") must be considered in evaluating the ALJ's findings. "The SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability." *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476 (4th Cir. 1999). Nonetheless, res judicata applies "to prevent the [Commissioner] from reaching an inconsistent result in a second proceeding based on evidence that has already been weighed in a claimant's favor in an earlier proceeding." *Lively v. Sec'y of Health & Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987). However, "a prior determination by the Commissioner is not conclusive[,] and the Commissioner may reach a different result if there is substantial evidence of improvement in the claimant's condition." *Carter v. Barnhart*, 217 F. Supp. 2d 703, 705 (W.D. Va. 2002).

A

Watson contends that the ALJ erred by failing to conclude that he suffers from a severe mental impairment. "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a) (2009). Basic work activities include understanding, carrying out, and remembering simple instructions; using

judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b) (2009).

The ALJ found that Watson suffered from "mild depression and anxiety" and concluded that these ailments "do not cause more than minimal limitation in [Watson's] ability to perform basic mental work activities and [are] therefore non-severe." (R. at 24.) Watson challenges that finding, claiming that the opinions of psychologist B. Wayne Lanthorn, Ph.D., and physician Ugwuala Nwauche, M.D., as well as the treatment records from Wise County Behavior Health Sciences ("WCBHS"), demonstrate that he suffers from severe mental impairments. I disagree.

Although the ALJ adjudicating Watson's previous claim of disability found that Watson's depression and anxiety were severe ( R. at 29), the treatment records from WCBHS show that Watson condition had improved greatly from 2006 onward. Under the first claim, Watson alleged that December 29, 2003 was the onset of disability. The Commissioner found Watson not disabled as of April 17, 2006. Watson filed his current claim less than two months later, alleging a disability that began April 18, 2006. Thus, the findings of the previous adjudication are highly relevant to the latest claim. Nevertheless, substantial evidence supports the conclusion that Watson's mental impairments had lessened in severity.

Watson was first noted as having symptoms of anxiety and depression by his primary care physician, Dr. Nwauche, in late 2003 and was referred to WCBHS for treatment. In his initial assessment at WCBHS in January 2004, Watson stated he had social anxiety and paranoia around people, but reported no problems with his independent daily living activities and no inappropriate behavior. His main complaints were anxiety, depression, and anger stemming from fights with his live-in boyfriend. Initially, the psychiatrist at WCBHS, Randall Pitone, M.D., diagnosed Watson with panic disorder with mild agoraphobia, social anxiety disorder, and major depressive disorder. (R. at 459-60.) Dr. Pitone noted though that Watson's intelligence was "within normal range," and "[h]is perception [was] clear, thought associations [were] intact, thinking [was] organized and goal-directed with normal rate and flow." (R. at 459.) Dr. Pitone started Watson on psychiatric medications, and Watson continued to receive treatment from WCBHS as late as February 2007.

When Watson was reassessed by WCBHS in early 2006, his diagnosis had changed to anxiety disorder NOS (not otherwise specified) and adjustment disorder. The assessor at WCBHS found Watson to have "[a]verage intelligence or above" and strong insight into his problems. (R. at 384.) Watson continued to report he had no difficulties with activities of daily living and independent living. Between June 2006 and February 2007, Watson's condition had improved to the point that his mood

fluctuated between normal with pleasant affect to mildly depressed with congruent affect. Watson complained of no adverse effects of medication. Additionally, Watson's annual reassessment in 2007 produced the same results as the one in 2006. The main problem that Watson had throughout his treatment with WCBHS was his living situation — specifically, his inability to get along with his roommate, who was also his ex-boyfriend.

In contrast, Dr. Lanthorn painted a bleak picture of Watson's mental health when he evaluated Watson on January 10, 2008. However, the ALJ gave "no weight to Dr. Lanthorn's opinions because the rest of the record d[id] not support such severe mental/intellectual limitations." (R. at 24-25 (emphasis omitted).) Dr. Lanthorn was hired by counsel to perform a psychological evaluation and had never previously treated Watson. He reported that Watson "had a very limited daily activity schedule" and "remained highly anxious and severely depressed as well as having marked insomnia." (R. at 569.) Dr. Lanthorn also found Watson to have borderline intellectual functioning, social phobia, pain disorder associated with psychological factors and general medical conditions, and personality disorder NOS. He opined that Watson would do poorly relating to co-workers, dealing with public, using judgment with the public, and interacting with supervisors. Dr. Lanthorn also believed that Watson would not be able to behave in an emotionally stable manner or relate

predictably in social situations and could not complete detailed or complex job instructions.

Dr. Lanthorn's report, however, was contradicted by the WCBHS records. As the ALJ noted, "In treatment records, [Watson's] depression and anxiety are described as 'mild' and his condition as stable on medications. Upon psychiatric examination, his mood and affect are within normal limits and [Watson] is cooperative and interactive." (R. at 25 (emphasis and citations omitted).) By Watson's own reports to WCBHS, depression and anxiety were not significantly impacting his life. Both state agency mental health experts who examined Watson's treatment records found that his depression and anxiety were not severe.

Moreover, Dr. Lanthorn's conclusion that Watson had limited intellectual ability was undercut by the several notations by treating medical personnel at WCBHS of Watson's average or better intelligence and insight. In the April 2006 benefits determination, the previous ALJ did not find any severe limitations to Watson's intelligence, and there is no indication that Watson's intellect deteriorated since then. Thus, substantial evidence supported the ALJ's decision to discount Dr. Lanthorn's findings.

Contrary to Watson's contention, Dr. Nwauche's records do not suggest that Watson's mental impairments were severe. Dr. Nwauche did not go into any detail

about the severity of Watson's mental impairments in his treatment notes; he simply listed anxiety and depression as ailments Watson suffered from. As a primary care physician, Dr. Nwauche referred Watson to WCBHS for treatment of his mental impairments and did not attempt to treat them himself. Therefore, neither the records of Dr. Nwauche nor Dr. Lanthorn require overturning the ALJ's finding as to Watson's mental impairments.

B

Watson also argues that the ALJ erred by improperly determining his residual functional capacity. Watson claims he is limited more severely by his chronic low back pain with radiculopathy, depression, and anxiety than the ALJ concluded. I find that the ALJ failed to consider key evidence of Watson's physical condition, and as a result, his finding as to Watson's residual functional capacity is not supported by substantial evidence.

As discussed above, the ALJ's finding that Watson's depression and anxiety were not severe impairments is supported by substantial evidence. In his previous claim, Watson was found to have mild difficulty "in his ability to interact with co-workers, supervisors, and the public and to respond appropriately to work pressures." *Watson*, 2007 WL 2481343, at *1. However, as noted above, his depression and anxiety had improved since that decision was rendered. Therefore, it was reasonable

for the ALJ to find that Watson did not have any work-related limitations caused by his mental disorders.

As for physical limitations, the ALJ determined that Watson was limited to light work that involved no more than six hours of standing or walking and six hours of sitting per eight-hour day, along with other postural and environmental limitations. This residual functional capacity is more restrictive than that recommended by two state agency medical experts, who concluded that Watson was able to perform the full range of light work without any additional non-exertional limitations, but less restrictive than the ALJ found in Watson's previous claim. In that adjudication, the ALJ concluded that Watson was only able to stand or walk two hours in an eight-hour workday, as long as he was permitted to make postural changes during the day, thus limiting Watson to sedentary work. *Id.*

Accordingly, the issue here is whether substantial evidence supports a finding that Watson's condition had improved from the time period of his previous claim, December 29, 2003 through April 17, 2006, to the time period of this claim adjudication, April 18, 2006 through February 29, 2008, to the point that Watson was able to stand or walk for up to six hours, rather than two, in an eight-hour day.

The Commissioner "must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant was

capable of performing [light] work." *Lively*, 820 F.2d at 1392. Here, the ALJ's only reason for concluding that Watson could perform work at a higher exertional level than previously determined was "that additional healing and medications" had improved Watson's back condition since his last claim. (R. at 29.) But the ALJ's conclusion that Watson had healed is contrary to the objective medical evidence.

In March 2003, an MRI of Watson's spine revealed "disc degeneration at the L4-L5 level with a central minimal disc protrusion that had not impinged upon his nerve root." *Watson*, 2007 WL 2481343, at *5. In January 2007, after the adjudication of Watson's first claim, a second MRI was taken and it showed his condition had worsened: "[m]oderate central L4-5 disc protrusion with left lateral recess narrowing and suspect[ed] left L5 nerve root impingement." (R. at 316, 485.) The MRIs show that from 2003 to 2007, the disc protrusion had increased, and Watson was beginning to suffer from a possible nerve root impingement. Yet, the ALJ did not explain — or even mention — the 2007 MRI in his decision despite the "general requirement that a[n] ALJ is required to explicitly indicate the weight given to relevant evidence." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989); *see also Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979) (holding that the ALJ "must indicate explicitly that all relevant evidence has been weighed and its weight").

As far as the additional medications the ALJ alluded to, the ALJ did not mention what those were and why they enabled Watson to sit or stand for longer periods. Therefore, I find that the ALJ's determination of Watson's physical ability to perform work was not supported by substantial evidence. This case must be remanded so that the Commissioner can fully consider all of the relevant evidence, including the 2007 MRI, and reevaluate Watson's physical residual functional capacity.

IV

For the foregoing reasons, both parties' motions for summary judgment will be denied, and the final decision of the Commissioner will be vacated and the case remanded for further proceedings consistent with this Opinion. An appropriate final judgment will be entered.

DATED: August 17, 2010

/S/ JAMES P. JONES
United States District Judge